**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**OFFSHORE EXPLORATION AND PRODUCTION**
**LLC,**                                                    **13 Civ. 3537 (JGK)**

                **Plaintiff,**        <u>**OPINION AND ORDER**</u>

      **- against –**

**MORGAN STANLEY PRIVATE BANK, N.A.,**
**ET AL.,**

              **Defendants.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

The plaintiff, Offshore Exploration and Production, LLC ("Offshore"), brings this action against defendants Korea National Oil Corporation ("KNOC"), Ecopetrol S.A., and Morgan Stanley Private Bank, N.A.  The Complaint seeks a declaratory judgment that Morgan Stanley, acting as an Escrow Agent, must release to KNOC and Ecopetrol over $75 million from an escrow fund that Morgan Stanley Private Bank, N.A. now holds pursuant to an escrow agreement.  An arbitration panel has already determined that Offshore must pay that amount to KNOC and Ecopetrol.  However, KNOC and Ecopetrol contend that the money should not come from the escrow fund but rather should be paid independently by Offshore so as not to reduce the amount of the escrow fund that would otherwise be available for other obligations owed by Offshore to KNOC and Ecopetrol.  KNOC and Ecopetrol contend that the parties agreed in a Stock Purchase

1

Agreement to commit the resolution of this dispute to the arbitrators and that this action should be stayed or dismissed while the arbitrators decide the dispute.

The defendants move under Federal Rule of Civil Procedure 12(b) and the Federal Arbitration Act, 9 U.S.C § 3, to stay or dismiss this proceeding pending arbitration.  Offshore cross-moves for summary judgment on its declaratory judgment claim.  This Court has jurisdiction pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 203, and pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.  For the reasons explained below, this action should be stayed to allow the arbitrators to decide whether the dispute among the parties is subject to arbitration and, if it is, to decide the dispute.  The plaintiff's motion for summary judgment is therefore denied without prejudice pending a decision by the arbitrators.

I.

Unless otherwise indicated, the following facts are accepted as true for purposes of the pending motions.

A.

Offshore is a private investment holding company incorporated in Delaware, with its principal place of business

2

in Houston, Texas.  (Complaint ¶ 6.)  On December 29, 2008,
Offshore entered into a Stock Purchase Agreement with defendant
purchasers KNOC and Ecopetrol S.A. (collectively, the
"Purchasers").  (Declaration of Mark P. Gimbel ("Gimbel Decl.")
Ex. A (Stock Purchase Agreement, or "SPA").)  KNOC, the national
oil company of the Republic of Korea, is organized under Korean
law and has its principal place of business in the Republic of
Korea.  (Complaint ¶ 9.)  Ecopetrol S.A., the national oil
company of Colombia, is incorporated in Colombia and has its
principal place of business in Colombia.  (Complaint ¶ 8.)

     Pursuant to the Stock Purchase Agreement, Offshore sold to
the Purchasers all of the issued and outstanding common stock of
its subsidiary, Offshore International Group, Inc., and each of
Offshore International Group's subsidiaries.  (Declaration of
Derek L. Shaffer ("Shaffer Decl.") Ex. L at 2.)  Under the Stock
Purchase Agreement, Offshore must "indemnify and defend the
Purchaser Indemnitees and hold the Purchaser Indemnittees
harmless from and against" various taxes that the subsidiaries
might owe.  (SPA § 7.4(a).)  The Stock Purchase Agreement also
states that if contested taxes "must be paid under applicable
Law prior to or upon commencement of a contest proceeding,
[Offshore] shall pay such Taxes to the applicable Governmental

Authority prior to or upon commencement of such proceeding." (SPA § 7.4(d).)

In order to secure the Purchasers' potential indemnification claims under the Stock Purchase Agreement, the parties agreed that the Purchasers would deliver $150 million of their $1.2 billion purchase price to an escrow agent: Morgan Stanley Trust, N.A.[1] ("Morgan Stanley"). (Gimbel Decl. Ex. A ("First Amendment to the SPA") § 2.3(b)(i).)[2] The Purchasers were permitted to apply the escrowed funds to various indemnification claims arising under the Stock Purchase Agreement and funds were to be disbursed "in accordance" with the terms of the Escrow Agreement to which Offshore, the Purchasers, and Morgan Stanley were parties. (First Amendment to the SPA § 2.3(b)(i).) The Stock Purchase Agreement required that the escrow period be extended and that an adequate amount in escrow be retained to cover any indemnification claim timely asserted. (First Amendment to the SPA § 2.3(b)(i).)

Additional rights and procedures regarding disbursement from the escrow were enumerated in Section 8.6 of the Stock

---

[1] Morgan Stanley Trust, N.A. has since been succeeded by Morgan Stanley Private Bank, N.A., a defendant to this action.

[2] The First Amendment to the SPA is appended to Exhibit A of the Gimbel Declaration but modifies only select provisions of the SPA. Where the First Amendment to the SPA modifies a provision cited in this Opinion, citation to the First Amendment to the SPA is indicated.

Purchase Agreement.  That section provided that "[b]y written notice to Seller specifying in reasonable detail the basis for set-off, Purchaser may assert a claim to set off any amount to which it is or if Seller has objected has been determined to be entitled under Article 7 and . . . Article 8 against the Escrow Amount."  (SPA § 8.6.)  Section 8 also stated that "[n]either the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit Purchaser in any manner in the enforcement of any other remedies that may be available to it."  (SPA § 8.6.)

In the event that any party breached its obligations under the Stock Purchase Agreement, the Agreement provided to the non-breaching party "the right to seek specific performance of this Agreement without the necessity of proving the inadequacy of money damages as a remedy."  (SPA § 8.4.)  Additionally, the Stock Purchase Agreement contained a broad, mandatory arbitration clause providing that:

> Any dispute, controversy or Action arising out of or relating to this Agreement, or the breach thereof . . . shall be determined by arbitration administered by the American Arbitration Association in accordance with its International Arbitration Rules.

(SPA § 10.7(a).)

B.

Offshore and the Purchasers signed the First Amendment to the Stock Purchase Agreement as of February 5, 2009.  (First Amendment to the SPA.)  Offshore, the Purchasers, and Morgan Stanley also executed the Escrow Agreement as of February 5, 2009.  The Escrow Agreement provides procedures for the disbursement of funds held in escrow (the "Escrow Amount").  Disbursement must occur if any Purchaser submits a Purchaser's Indemnity Certificate and Offshore does not object within thirty days.  (Complaint Ex. A ("Escrow Agreement") § 3.)  However, if Offshore disputes a claim made against the Escrow Amount, Morgan Stanley is prohibited from disbursing funds:

> except in accordance with either (i) written instructions executed both by an authorized officer of Purchaser and by an authorized officer of Seller ("**_Joint Instructions_**"), or (ii) a certificate delivered by any Purchaser to the Escrow Agent, executed by an authorized officer of such Purchaser (a "**_Final Award Certificate_**") . . . .

(Escrow Agreement § 3.)  A Final Award certificate must include the amount of the contested amount to which the Purchaser is entitled and an "Arbitral Award" confirming the Purchaser's entitlement.  (Escrow Agreement § 3.)  Morgan Stanley is also required to release escrow funds to Offshore when any Purchaser "delivers to the Escrow Agent a certificate of such Purchaser . . . [stating] that an Indemnification Item, in a

specific amount, was satisfied by Seller independent of this
Indemnification Escrow Agreement . . . ." (Escrow Agreement
§ 3.)

> The Escrow Agreement specifically provides that:
>
> In the event that the Escrow Agent shall be uncertain
> as to its duties or rights . . . it shall be entitled
> to refrain from taking any action . . . until it shall
> be directed otherwise in writing by all of the other
> Parties hereto, by a final order or judgment of a
> court of competent jurisdiction or, subject to Section
> 3 of this Indemnification Escrow Agreement, a final
> decision of an arbitral tribunal pursuant to Section
> 10.7 of the Stock Purchase Agreement.

(Escrow Agreement § 5(b).) The Escrow Agreement contains a non-
exclusive forum selection clause providing that each party
"irrevocably waives any objection on the grounds of venue, forum
non-conveniens or any similar grounds and irrevocably consents
to service of process by mail or in any other manner permitted
by applicable law and consents to the jurisdiction of the courts
located in the State of New York." (Escrow Agreement § 12.)
The Agreement also contains a merger clause, which states that
"[i]n the event of any discrepancy or inconsistency between the
provisions of this Indemnification Escrow Agreement and the
provisions of the Stock Purchase Agreement, the provisions [in
the Escrow Agreement] shall prevail and be deemed to reflect the
intent and understanding of the Parties hereto." (Escrow
Agreement § 12.) Any funds remaining in escrow, and not

required to be retained in escrow pursuant to Section 2.3(b)(i)
of the Amended Stock Purchase Agreement, were to be released to
Offshore on February 5, 2011.  (Escrow Agreement § 4.)  Both the
Escrow Agreement and Stock Purchase Agreement are to be
interpreted under New York law.  (Escrow Agreement § 12; SPA
§ 10.6.)

C.

Among the Offshore subsidiaries that the Purchasers
acquired under the Stock Purchase Agreement is a Peruvian oil
company, Savia Peru S.A. ("Savia").  (Shaffer Decl. Ex. L at 2.)
On February 25, 2010, the Purchasers sought indemnification
under Section 7.4 of the Stock Purchase Agreement for
$42,235,255 in outstanding tax liabilities that Savia allegedly
owed to the Peruvian government.  (Shaffer Decl. Ex. B.)  The
Purchasers delivered to Morgan Stanley a claim certificate that
elaborated the Purchasers' indemnification claim and requested
that Morgan Stanley promptly contact Offshore to ascertain
whether Offshore objected to the Purchasers' disbursement
request.  (Shaffer Decl. Ex. B.)  On March 26, 2010, Offshore
informed Morgan Stanley and the Purchasers that it objected to
"any release of the Escrow Amount for the full amount" of the

Purchasers' indemnification claim, the validity of which Offshore was contesting under SPA § 7.4.  (Shaffer Decl. Ex. C.)

On October 1, 2010 and January 28, 2011, the Purchasers delivered to Morgan Stanley indemnity certificates for additional tax liabilities sought by the Peruvian government against Savia.  (Shaffer Decl. Exs. D, F.)  Offshore objected to the disbursement of both claims.  (Shaffer Decl. Exs. E, G.)

After the Purchasers, through Savia, paid $75,308,179.03 to the Peruvian Government, the Purchasers sought through arbitration an interim award ordering Offshore to specifically perform its alleged duty to reimburse the Purchasers for that amount.  (Gimbel Decl. Ex. B ("Interim Award") at 1.)  On April 15, 2013, the arbitration panel issued an Interim Award ordering Offshore to pay to the Purchasers within thirty days the full amount that the Purchasers sought.  (Interim Award at 7.)  While the award required "reimbursement," it did not specify whether reimbursement was to come from the Escrow Amount.  (Interim Award at 7.)

Abandoning its prior objections, on May 2, 2013, Offshore instructed Morgan Stanley to release $75,308,179.03 from the Escrow Amount to the Purchasers. (Complaint ¶ 22.)  With the benefit of the arbitration award, the Purchasers no longer sought to have that amount paid from the Escrow Amount.  On May

9

10, 2013, the Purchasers objected to the disbursement of funds from the Escrow Amount. (Complaint ¶ 23.) According to the Purchasers, Morgan Stanley was prohibited from disbursing funds because, under Section 3 of the Escrow Agreement, Offshore's initial objection to disbursement of funds from the Escrow Amount precluded Morgan Stanley from releasing any funds until the Purchasers submitted Joint Instructions with Offshore or the Purchasers delivered a Final Award Certificate. (Complaint Ex. C.) The Purchasers maintained that they were under no obligation to submit Joint Instructions or to deliver a Final Award Certificate because, under Section 8.6 of the Stock Purchase Agreement, the Purchasers initial decision to seek payment from the Escrow Amount did not constitute an election of remedies or in any way limit the remedies that the Purchasers were entitled to pursue. (Complaint Ex. C at 2.) The Purchasers also argued that paying the Interim Award from the Escrow Amount would deplete the Escrow Amount and would leave the Escrow Amount substantially below the amount of unresolved indemnification claims. (Complaint Ex. C at 2-3.)

Morgan Stanley maintains that it is "uncertain as to its duties or rights under the Escrow Agreement" and has not released the $75,304,179.03 to the Purchasers. (Complaint ¶ 25; Morgan Stanley Answer ¶ 29.) As a result, Offshore commenced

this action on May 24, 2013, seeking a declaratory judgment that, "under the Escrow Agreement, the Escrow Agent shall cause an immediate release of $75,308,179.03" to the Purchasers. (Complaint ¶ 31.)

The Purchasers now seek to stay or dismiss this action so that the arbitration panel may decide whether the Purchasers are entitled to seek from Offshore direct payment of the Interim Award.  The parties have advised that the issue of the proper source for payment of the Interim Award has been fully briefed to the arbitration panel, which is prepared to issue a prompt decision but has postponed that decision pending this Court's decision on the pending motions.  Offshore opposes the motion to stay or dismiss this action and seeks summary judgment on its declaratory judgment claim.[3]  Morgan Stanley has not filed papers in connection with these cross-motions.


II.

This action arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, (the "Convention"), because the agreements at issue are commercial and not entirely between citizens of the United States.  9 U.S.C. § 202; see also

---

[3] Additionally, Offshore moves to strike portions of the defendants' reply to Offshore's Rule 56.1 statement.

Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 391 (2d Cir. 2011). "The goal of the Convention is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions." David L. Threlkeld & Co. v. Matallgesellschaft Ltd., 923 F.2d 245, 250 (2d Cir. 1991). Moreover, "[t]he adoption of the Convention by the United States promotes the strong federal policy favoring arbitration of disputes, particularly in the international context." Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999); see also Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999) (The "bias in favor of arbitration[] is even stronger in the context of international transactions.") (internal quotation marks omitted).

Disputes governed by the Convention must be resolved under the body of federal arbitration law developed pursuant to the Federal Arbitration Act ("FAA"), so as to avoid injecting "parochialism and uncertainty into international arbitration." Republic of Ecuador, 638 F.3d at 392; see also 9 U.S.C. § 208.[4]

---

[4] 9 U.S.C. § 208 provides that the FAA applies to actions and proceedings brought under the Convention to the extent that the FAA is not in conflict with the Convention and the legislation that implements it.

A court shall stay any court action of any issue "referable to arbitration" under a written agreement.  9 U.S.C. § 3;[5] see also, e.g., Alghanim v. Alghanim, 828 F. Supp. 2d 636, 643 (S.D.N.Y. 2011).  Under federal arbitration law, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986).  However, the FAA prescribes for the courts a limited role in evaluating arbitration agreements.  Where no statutory claims are asserted, courts are to consider only whether a valid arbitration agreement exists and, if it does, whether the scope of the arbitration agreement extends to a particular dispute.  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).  In this case, the parties do not dispute that they have entered into a valid arbitration agreement contained in the Stock

---

[5] 9 U.S.C. § 3 provides that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

Purchase Agreement.  Rather, the parties dispute the scope of that arbitration provision.

A.

Offshore asserts that Morgan Stanley is obligated to release from the Escrow Amount funds sufficient to satisfy the Interim Award.  The Purchasers argue that the parties have agreed to let an arbitrator decide the threshold question of whether Offshore's claim is arbitrable.  Under the FAA, "there is a general presumption that the issue of arbitrability should be resolved by the courts."  Contec Corp. v. Remote Solution, Co., 398 F.3d 205, 208 (2d Cir. 2005); see also First Options of Chicago Inc., v. Kaplan, 514 U.S. 938, 944-45 (1995).  However, the question of arbitrability is one for an arbitrator and not for the courts if there is "clear and unmistakable evidence" that the parties intended to submit the question for arbitration.  Contec Corp., 398 F.3d at 208; see also Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002).  New York State law, which applies to the contracts in this case, follows the same rules with respect to the presumption relating to arbitrability.  Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003).

The Second Circuit Court of Appeals has explained that when "parties explicitly incorporate [into arbitration agreements]

rules that empower an arbitrator to decide issues of
arbitrability, the incorporation serves as clear and
unmistakable evidence of the parties' intent to delegate such
issues to an arbitrator."  Contec, 398 F.3d at 208; see also
Shaw Grp. Inc., 322 F.3d at 121; In re Smith Barney Shearson
Inc. v. Sacharow, 689 N.E.2d 884, 888 (1997); Life Receivables
Trust v. Goshawk Syndicate 102 at Lloyd's, 888 N.Y.S. 2d 458,
459 (App. Div. 2009).  In Contec, the Court of Appeals held that
the parties had clearly and unmistakably demonstrated their
intent to let an arbitrator determine arbitrability by stating
that arbitration should proceed "in accordance with the
Commercial Arbitration Rules of the American Arbitration
Association."  398 F.3d at 208-11.  The court so held because
American Arbitration Association Commercial Arbitration Rule 7
commits threshold questions of arbitrability to the arbitrator.
Id. at 208.  Specifically, Rule 7 provides that "[t]he
arbitrator shall have the power to rule on his or her own
jurisdiction, including any objections with respect to the
existence, scope or validity of the arbitration agreement."  Id.
(alteration in original).

The arbitration clause at issue in this case provides that
"[a]ny dispute, controversy or Action arising out of or relating
to this Agreement, or the breach thereof . . . shall be

15

determined by arbitration administered by the American Arbitration Association in accordance with its International Arbitration Rules." (SPA § 10.7.) Article 15 of the American Arbitration Association International Arbitration Rules states that the arbitral tribunal "shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." American Arbitration Association, Dispute Resolution Procedures, Article 15 (June 1, 2009). This language mirrors precisely the language held to constitute clear and unmistakable evidence of the parties' intent to submit arbitrability to arbitration in Contec, 398 F.3d at 208. Accordingly, the parties have manifested their clear and unmistakable intent to delegate to the arbitral panel threshold questions concerning the arbitrability of disputes that may trigger Section 10.7 of the Stock Purchase Agreement.

B.

Offshore argues that the parties dispute over whether Offshore can require that the Interim Award be paid for from the Escrow Amount is a dispute that concerns only the Escrow Agreement, which contains no arbitration provision. Offshore contends that this dispute does not relate to the Stock Purchase Agreement and that the parties have not agreed that the

16

arbitrators should decide whether Offshore's claim is
arbitrable.  The short—and sufficient—response to this argument
is that, consistent with <u>Contec</u>, the parties agreed in the Stock
Purchase Agreement that questions concerning whether this
dispute are encompassed within the arbitration clause of the
Stock Purchase Agreement should be decided by the arbitrators.

Moreover, Offshore's arguments that the dispute over how
the Interim Award should be paid does not relate to the Stock
Purchase Agreement and relates solely to the Escrow Agreement
are without merit.

Section 7 of the Stock Purchase Agreement commits to
arbitration "[a]ny dispute, controversy, or Action arising out
of or relating to" the Stock Purchase Agreement.  (SPA § 10.7.)
This language constitutes "the paradigm of a broad" arbitration
agreement.  <u>Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.</u>, 58
F.3d 16, 20 (2d Cir. 1995).  "Where the arbitration clause is
broad, there arises a presumption of arbitrability and
arbitration of even a collateral matter will be ordered if the
claim alleged implicates issues of contract construction or the
parties' rights and obligations under it." <u>Louis Dreyfus Negoce
S.A. v. Blystad Shipping & Trading Inc.</u>, 252 F.3d 218, 224 (2d
Cir. 2001) (internal quotation omitted).  This is so because
"[w]hen parties use expansive language in drafting an

arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated." Id. at 225 (internal quotation marks omitted).

The present dispute over whether the Purchasers are permitted to seek indemnification payments from Offshore without drawing down the Escrow Amount plainly "implicates" the Stock Purchase Agreement that contains a broad arbitration clause.  An arbitration panel has already found that under Section 7.4(d) of the Stock Purchase Agreement, Offshore was required to pay the taxes that Savia owed to the Peruvian government.  It is undisputed that Offshore failed to satisfy this obligation and that, as a result, Offshore is liable to the Purchasers for the full amount of the Interim Award.

The Purchasers plausibly argue that paying the Interim Award from the Escrow Amount would be inconsistent with Section 7.4(a) of the Stock Purchase Agreement, which requires that Offshore "hold the Purchaser Indemnittees harmless from and against" taxes like those underlying the Interim Award. Reducing the amount of the Escrow Amount may dilute Offshore's indemnification obligation.  The Purchasers also plausibly assert that their right to indemnification independent of the Escrow Amount is based on Section 2.3(b)(i) of the Stock Purchase Agreement, which requires that, at the close of the

18

period during which escrowed funds are held, an amount
sufficient to cover outstanding indemnification claims remain in
the Escrow Amount.  The Purchasers also assert that this action
cannot be resolved without deciding whether Stock Purchase
Agreement provisions regarding specific performance, (SPA
§ 8.4), and the election of remedies, (SPA § 8.6), apply.

　　　Whether the Purchasers are correct on the merits of their
claims under the Stock Purchase Agreement is plainly a matter
for the arbitrators and it is for the arbitrators in the first
instance to determine whether the claim is within the scope of
the arbitration clause.


                            C.

　　　Offshore makes several additional arguments to avoid
arbitration, but the arguments have no merit.  Offshore argues
that its claim arises exclusively under the Escrow Agreement
because it involves only the parties' obligations under Section
3 of that agreement.  Section 3 of the Escrow Agreement
establishes procedures for the disbursement of funds from the
Escrow Amount.  It does not resolve whether the Purchasers are
required to make a claim under Section 3 of the Escrow Agreement

                            19

or can seek independent payment from Offshore.[6]  Furthermore, on
its face, the various provisions of Section 3 require action by
the Purchasers and the Purchasers dispute, based on the Stock
Purchase Agreement, that they are required to accept payment of
the Interim Award from the Escrow Amount.

Offshore also argues that Section 10.7 of the Stock
Purchase Agreement cannot apply to this action because, to the
extent this action implicates the Stock Purchase Agreement at
all, it presents a conflict between provisions in the Escrow

---

[6] For this reason, Offshore's reliance on Teletech Europe B.V.,
v. Essar Servs. Mauritius, 921 N.Y.S.2d 62 (App Div. 2011), is
misplaced.  The parties in Teletech, like the parties here,
executed a stock purchase agreement creating an escrow account
to satisfy potential tax liabilities, and a collateral agreement
governing disbursement of funds from the escrow.  However,
Teletech involved a dispute over funds that an escrow agent had
allegedly released in error.  See Teletech Europe B.V. v. Essar
Servs., No. 108296-2009, 2009 WL 6490445, at *1 (N.Y. Sup. Ct.
N.Y. County Nov. 12, 2009).  The dispute concerned only whether
the escrow agent had acted wrongfully under the escrow
agreement.  Specifically, the dispute pertained to whether a
disbursement certificate filed by one party contained the
information necessary to trigger release, and whether release
was permissible without the parties' joint consent.  Id.
Accordingly, the First Department held that the action arose
specifically under the escrow agreement because that agreement
"contain[ed] the conditions precedent for release of the escrow
funds."  Teletech Europe B.V., 921 N.Y.S. 2d at 63.  In this
case, Morgan Stanley has not released any funds, nor is Morgan
Stanley under an apparent obligation to do so until the
Purchasers have sought release of those funds under the terms of
Section 3.  Teletech is thus inapposite.

Agreement and Stock Purchase Agreement.  According to Offshore,
any dispute that involves a conflict between the two agreements
is governed entirely by the Escrow Agreement because Section 12
of the Escrow Agreement provides that:

> In the event of any discrepancy or inconsistency
> between the provisions of this Indemnification Escrow
> Agreement and the provisions of the Stock Purchase
> Agreement, the provisions hereof shall prevail and be
> deemed to reflect the intent and understanding of the
> Parties hereto.

(Escrow Agreement § 12.)  Offshore's argument fails because it
has not established any conflict between the Stock Purchase
Agreement and Escrow Agreement.  Once Offshore objected to the
Purchasers' prior demand for a payment from the Escrow Amount,
Morgan Stanley was required to await further action from the
Purchasers, which has not occurred.  Neither the actions of
Morgan Stanley nor those of the Purchasers evince a conflict
between the Escrow Agreement and Stock Purchase Agreement.

　　Offshore contends that there is a procedural conflict
between the arbitration agreement in Section 10.7 of the Stock
Purchase Agreement and jurisdictional language in Section 12 of
the Escrow Agreement.  More specifically, Offshore relies on
Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth., 922 F.
Supp. 2d 435, 440 (S.D.N.Y. 2013), and Applied Energetics, Inc.
v. NewOak Capital Mkts., LLC, 645 F.3d 522, 525 (2d Cir. 2011),
to argue that jurisdictional terms like those in the Escrow

Agreement cannot be harmonized with an arbitration agreement
like that in the Stock Purchase Agreement, such that a conflict
exists and the Escrow Agreement controls.  However, both Goldman
Sachs and Applied Energetics in fact illustrate that there is no
procedural conflict between the provisions upon which Offshore
relies.

"In determining whether an agreement to arbitrate has been
supplanted by a later accord, courts in the Second Circuit look
to whether the subsequent agreement specifically preclude[s] or
provides positive assurance that a dispute is no longer subject
to arbitration."  Goldman, Sachs & Co., 922 F. Supp. 2d at 440
(internal quotation marks omitted) (alteration in original); see
also Bank Julius Baer & Co v. Waxfield Ltd., 424 F.3d 278, 284
(2d Cir. 2005).  In Goldman, Sachs & Co., the court held that a
forum selection clause supplanted the Financial Industry
Regulatory Authority's default rule that its members must
arbitrate disputes at a customer's request.  The forum selection
clause provided that:

> The parties agree that all actions and proceedings
> arising out of this Broker-Dealer Agreement or any of
> the transactions contemplated hereby shall be brought
> in the United States District Court in the County of
> New York and that, in connection with any such action
> or proceeding, submit to the jurisdiction of, and
> venue in, such court.

Id. at 438.  Relying on the plain language of the forum selection clause, the court found that "the breadth of the Forum Selection Clause ('all actions and proceedings'), its mandatory nature ('shall'), and its plain reference to judicial action ('the United States District Court in the County of New York')" evidenced positive assurance that the parties intended to litigate disputes arising from their agreement.  Id. at 443.

In Applied Energetics, the Court of Appeals gave effect to a second-in-time dispute resolution provision that contained obligatory language.  The parties had entered into two agreements, the first of which provided that "any dispute arising out of or relating to [it] . . . and/or the transactions contemplated hereby or thereby . . . shall be resolved through binding arbitration before the National Association of Securities Dealers . . . in New York City." Applied Energetics, 645 F.3d at 523 (omissions in original).  However, the initial agreement also stated that the parties "would enter into a subsequent, more formal agreement setting forth 'the terms and conditions contained" in the initial agreement." Id. at 523.  The subsequent agreement omitted any reference to arbitration, instead providing that:

> Any dispute arising out of this Agreement shall be adjudicated in the Supreme Court, New York County or in the federal district court for the Southern District of New York.

Id.  Moreover, the subsequent agreement contained a merger clause stating that it represented "the entire understanding and agreement between the parties."  Id. at 524.  Noting that the subsequent agreement used "all inclusive" and "mandatory" language in reference to adjudicating disputes, the Court of Appeals found that the dispute resolution provisions were in direct conflict with one another.  Id. at 525.  Because the subsequent agreement contained a merger clause, the Court of Appeals held that the conflicting provisions could not be read as complementary and thus that the subsequently ratified provision controlled.  Id. at 526.

In this case, there is no analogous conflict between the arbitration clause that appears in the Stock Purchase Agreement and the forum selection clause that appears in the Escrow Agreement.  While the arbitration agreement contains mandatory language, the forum selection clause in the Escrow Agreement does not.  Rather, the forum selection clause states that the parties "consent[] to the jurisdiction of the courts located in the State of New York."  The Court of Appeals has held that this permissive language is insufficient to provide positive assurance that the parties intended to override a broad arbitration clause in an earlier agreement.  See Bank Julius Baer, 424 F.3d at 284-85 (holding that broad arbitration

24

agreement governed dispute despite parties' assent to non-exclusive forum selection clause in subsequently enacted agreement).  Accordingly, the broad arbitration clause contained in Section 10.7 of the Stock Purchase Agreement must be given effect.

Finally, Offshore asserts that the failure to find that the Escrow Agreement's forum selection clause controls would render the clause without meaning and therefore "run contrary to the tenet of contract interpretation that all contractual provisions should be afforded meaning." The NASDAQ OMX Grp., Inc. v. UBS Secs. LLC, -- F. Supp. 2d --, 2013 WL 3942948, at *14 (S.D.N.Y. June 18, 2013).  However, if the forum selection and arbitration clauses can be harmonized in a way "that permits the [a]rbitration [c]lause to remain in effect," that reading must prevail.  Bank of Julius Baer, 424 F.3d at 283.  Such a reading is possible in this case.  The arbitration clause prevails, and arbitration must be used, when a dispute, such as the present one, relates to the Stock Purchase Agreement, even if it implicates the Escrow Agreement.  The dispute in this case is whether the Purchasers had the right under the Stock Purchase Agreement to require Offshore to pay the Interim Award independently of the Escrow Amount.  If, on the other hand, a dispute concerned only the escrow, it could be decided in

litigation.  For example, if the dispute was solely whether
Morgan Stanley breached its obligation under the Escrow
Agreement, by making a mistaken payment from the Escrow Amount,
that dispute might be pursued in litigation.


                                D.

        Because Offshore has not demonstrated that its claim
arises exclusively under the Escrow Agreement and the Purchasers
have demonstrated that the present action implicates several
clauses of the Stock Purchase Agreement, the parties' intent to
delegate to the arbitration panel issues of arbitrability is
clear and this proceeding must be stayed or dismissed pending a
decision by the arbitration panel.  9 U.S.C. §§ 3, 208.  It is
for the arbitrators in the first instance to determine whether
the Purchasers' claim is arbitrable and, if so, to decide it on
the merits.  This case should be stayed pending that arbitrable
decision.  Because Offshore's only claim in this case is before
the arbitration panel, Offshore's motion for summary judgment is
**denied without prejudice** pending the results of the arbitration
panel's decision.

                                26

**CONCLUSION**

The Court has considered all the remaining arguments of the parties.  To the extent not specifically addressed above, they are either moot or without merit.  For the foregoing reasons, the defendants' motion to stay or dismiss this action pending arbitration is **granted** and this action is **stayed pending the decision of the arbitration panel**.  The plaintiff's motion for summary judgment is **denied without prejudice pending the decision of the arbitration panel**.  The plaintiff's motion to strike the defendants' reply to its Rule 56.1 Statement is **denied as moot.  The Clerk is directed to close all pending motions.**

SO ORDERED.

Dated:    New York, New York
          November 29, 2013        _____/s/_____
                                        John G. Koeltl
                                  United States District Judge

27